1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA

10

11  JUAN LEWIS GALLARDO,                    Case No. 20-cv-09184 JSW

             Plaintiff,
12                                          **ORDER GRANTING SUMMARY**
        v.                                  **JUDGMENT IN FAVOR OF**
13                                          **DEFENDANTS; DISMISSING**
                                            **RETALIATION CLAIM; DENYING**
14                                          **DISCOVERY MOTION**
    CARL BOURNE, MD, et al.,
15                                          (Docket Nos. 36, 37)
             Defendants.
16

17

18                      **INTRODUCTION**

19        Plaintiff, a state prisoner proceeding *pro se*, filed this civil rights action pursuant to

20  42 U.S.C. § 1983 against prison officials and medical providers at the Salinas Valley State

21  Prison ("SVSP").  (Dkt. No. 1.)[1]  The Court found the complaint stated cognizable claims

22  against fifteen defendants.  The following thirteen Defendants have been served and have

23  answered the complaint: Correctional Officer D. Bittner, Correctional Officer K. Bock, Dr.

24  D. Bright, Lieutenant H. Clavijo, Correctional Officer DeAnzo, Chief Physician Care

25  Correspondent S. Gates, Dr. Waheed Ibrahimi, Chief Medical Executive Dr. K. Kumar,[2]

26

27  _____
    [1]  All page references herein are to the Docket pages shown in the header to each
    document and brief cited, unless otherwise indicated.

28  [2]  Defendant Kumar's title is provided in Defendants' motion for summary judgment.

United States District Court
Northern District of California

Appeals Examiner Captain H. Liu, Correctional Officer J. Lopez, Chief Executive Officer B. Omosaiye, J. Rojas, and Chief Appeals Officer M. Voong.  (Dkt. No. 10 at 3; Dkt. Nos. 14, 16.)  Two additional Defendants have not been served, Dr. Carl Bourne and Dr. Mao Nguyen.  (Dkt. No. 14; Dkt. No. 36 at 7 n.1.)  The served Defendants[3] have filed a motion for summary judgment.[4]  (Dkt. No. 36.)  Plaintiff has responded.  (Dkt. No. 41.)  Defendants have replied.  (Dkt. No. 43.)  For the reasons discussed below, Defendants' motion is GRANTED, and summary judgment is GRANTED in favor of the unserved Defendants.

# BACKGROUND

## I.   Overview[5]

Plaintiff was at all relevant times a prisoner at SVSP.  (Dkt. No. 36 at 8.)  On July 12, 2017, Plaintiff was stabbed by other inmates in his upper chest, abdomen, head, extremities, and back.  (*Id.* at 2.)  For several weeks after he was injured, Plaintiff received treatment both off-site at Natividad Medical Center (NMC) and on-site at SVSP.

Plaintiff alleges the medical care he received from medical providers at SVSP was constitutionally inadequate.  (Dkt. No. 1 at 12-14.)  Plaintiff's chief complaint is that he was assigned inappropriate housing while he was recovering from his injuries.  According

_____

(Dkt. No. 36 at 13 n.2.)

[3]  Unless otherwise noted, the Court's use of the term "Defendants" refers to the thirteen served Defendants who have submitted the motion for summary judgment (Dkt. No. 36), *i.e.*, all Defendants except Dr. Bourne and Dr. Nguyen.  (Dkt. No. 36 at 17-18.)

[4]  The Court notes that Defendant Liu was served with the complaint (Dkt. No. 14) and has answered (Dkt. No. 16).  Liu's name was not included in the introductory list of Defendants moving for summary judgment (Dkt. No. 36 at 6), however the motion itself presents arguments why the claims against him should be dismissed, (Dkt. No. 36 at 7, 17-18).  Because Plaintiff has addressed Liu's arguments in his response to the motion (Dkt. No. 41 at 31-32), the Court proceeds with the understanding that all parties agree Liu has joined in the motion for summary judgment.

[5]  The undisputed facts regarding the two unserved Defendants (Dr. Bourne and Dr. Nguyen) are included and are derived from briefs by the other parties.  (*See generally* Dkt. No. 36; Dkt. No. 41.)

2

to Plaintiff, he should have been housed in the prison's medical facility, known as the Correctional Treatment Center (CTC), instead of being housed in administrative segregation.  (*Id.* at 15.)

Plaintiff pursued a medical grievance regarding the allegedly inadequate medical care he received, which was assigned the tracking number SVSP HC 17057996 (hereinafter the "Medical Grievance").  (*Id.* at 2; Dkt. No. 36 at 12.)  The parties do not dispute that Plaintiff's Medical Grievance exhausted his administrative remedies with respect to his claims against the Defendants who provided medical care to him.  These are: (1) Dr. Ibrahimi; (2) Dr. Bright to the extent he was involved in providing medical care to Plaintiff; (3) Dr. Nguyen; and (4) Dr. Bourne to the extent he provided care as Plaintiff's primary care physician.  (See Dkt. No. 36 at 12-14, 18.)

Defendants Dr. Bright, Gates, Dr. Kumar, Omosaiye, and Dr. Bourne,[6] were each involved in various roles in the review of Plaintiff's exhausted Medical Grievance.  (Dkt. No. 36 at 8; Dkt. No. 36-5 at 8-20.)  Plaintiff alleges their denials of his Medical Grievance amounted to deliberate indifference to his serious medical needs.  (Dkt. No. 1 at 15; Dkt. No. 36 at 18.)  The parties dispute whether Plaintiff exhausted his administrative remedies with respect to his claims against Dr. Bright, Gates, Dr. Kumar, and Omosaiye (as well as unserved Defendant Dr. Bourne) for their roles in responding to his Medical Grievance. (Dkt. No. 36 at 18.)

Plaintiff's claims against the remaining Defendants, who are not medical providers and were not involved in evaluating his Medical Grievance, stem from the same July 12, 2017, assault but take a different track.  Plaintiff alleges that SVSP's gang investigators pressured him to cooperate with their investigation into the assault, but when Plaintiff

---

[6] Dr. Bright and Dr. Bourne provided Plaintiff medical care and played a part in reviewing Plaintiff's Medical Grievance.  Dr. Bright was on-call when Plaintiff returned to SVSP from NMC, and authorized "normal housing."  (Dkt. No. 36 at 8; Dkt. No. 36-3 at 48.)  Dr. Bourne was Plaintiff's primary care provider.  (Dkt. No. 36 at 9; Dkt. No. 36-3 at 4-5 ¶ 15.)

United States District Court
Northern District of California

refused to do so, these Defendants were deliberately indifferent to his medical needs by keeping him in administrative segregation instead of either the CTC or regular prison housing.  (Dkt. No. 1 at 4-5, 16-17; Dkt. No. 41 at 34.)

Plaintiff pursued a grievance against prison officials who were allegedly involved in his housing assignments, some of whom allegedly threatened and retaliated against Plaintiff for his refusal to cooperate with the investigation into the July 12, 2017, assault. (Dkt. No. 36-4 at 9.)  This exhausted grievance was assigned the tracking number SVSP-L-17-04726 (hereinafter the "Custodial Grievance").  (*Id.*; *see also* Dkt. No. 1 at 4 (Plaintiff alleges he filed the separate Custodial Grievance because of "staff[']s influence on my housing and medical needs.  Health Care and Custodians have separate forms to file, in regard to grievances, even though the complaint may evolve from the same set of facts, or staff members may be conspiring in the same action.").)  The parties do not dispute that Plaintiff's Custodial Grievance exhausted his claims against Defendants Clavijo and DeAnzo.  (Dkt. No. 36 at 17.)  The parties dispute whether Plaintiff's Custodial Grievance exhausted Plaintiff's claims against Defendants Bittner Bock, Lopez, and Rojas.  (*Id.*)

Defendants Liu and Voong were both involved in the review of Plaintiff's exhausted Custodial Grievance.  (Dkt. No. 1 at 16; Dkt. No. 41 at 75, 78.)  The parties dispute whether Plaintiff exhausted his administrative remedies with respect to his claims against Liu and Voong.  (Dkt. No. 36 at 17-18.)

In their motion for summary judgment, most of the Defendants argue that Plaintiff failed to exhaust administrative remedies with respect to his claims against them.  (*Id.* at 15-18.)  All Defendants also argue that they were not deliberately indifferent to Plaintiff's serious medical needs.  (*Id.* at 18-22.)  Third, Defendants argue that they are entitled to qualified immunity.  (*Id.* at 23-24.)

## II.  <u>Plaintiff's Medical Treatment History</u>

Based on his initial evaluation of Plaintiff's injuries on July 12, 2017, Defendant

Dr. Ibrahimi arranged to have Plaintiff transferred to NMC, where Plaintiff remained until he was returned to SVSP on July 19, 2017.  (Dkt. No. 36-3 at 3 ¶ 6 (Bright Declaration).)  Defendants Dr. Bright and Dr. Nguyen separately conferred with NMC medical providers (a doctor, a nurse practitioner, and a nurse) about Plaintiff's condition when Plaintiff was transferred back to SVSP.  (*Id.* at 3 ¶¶ 7-9.)  Dr. Bright and Dr. Nguyen each approved Plaintiff for "normal housing"[7] with daily wound care by a nurse.  (Dkt. No. 36 at 8; Dkt. 36-3 at 3 ¶¶ 7-9.)  Plaintiff argues he needed a higher level of care and should have been housed in the CTC.  (Dkt. No. 1 at 15; Dkt. No. 41 at 23-24.)  Plaintiff alleges he could not properly care for his hygienic needs himself and should have been in an ADA cell.  (Dkt. No. 1 at 13.)

On July 20, 2017, Plaintiff sought emergency medical treatment for weakness, abdominal pain, and chest pain.  (Dkt. No. 36-3 at 3 ¶ 10.)  Dr. Ibrahimi evaluated Plaintiff, noting chest pain at the surgical site, however the site appeared clean, dry, and intact.  (*Id.* at 3 ¶ 11.)  Dr. Ibrahimi  arranged to have Plaintiff transferred to NMC.  (*Id.* at 4 ¶ 11.)  NMC evaluated Plaintiff and sent him back to SVSP the same day.  (*Id.* at 4 ¶ 13; *id.* at 8 ¶ 30.)  Dr. Ibrahimi discussed Plaintiff's condition with an NMC nurse.  (*Id.* at 4 ¶ 13.)  On Plaintiff's return to SVSP, Dr. Ibrahimi again approved Plaintiff for "normal housing" with daily wound care, a short-term wheelchair for 24 hours, physical therapy, and a walker if needed.  (*Id.* at 4 ¶ 14.)

According to Dr. Bright, who reviewed Plaintiff's medical records, "[e]ach time Plaintiff returned from NMC, hospital providers conferred with medical staff at the prison, and medical doctors determined that it was medically safe for Plaintiff to return to his housing and that he did not need a higher level of care."  (*Id.* at 8 ¶ 30.)

On July 21, 2017: (1) Plaintiff was seen by his primary care physician, Defendant

---

[7]  In Plaintiff's case, "normal housing" meant non-medical housing in administrative segregation because Defendant Clajivo had ordered Plaintiff to be placed in administrative segregation immediately following the July 12, 2017, assault.  (Dkt. No. 1 at 11.)

Dr. Bourne, who entered orders to continue wound care and adjusted Plaintiff's pain medication (Dkt. No. 36 at 9; Dkt. No. 36-3 at 4 ¶ 5); and (2) Plaintiff submitted a request to be moved to the CTC.  (Dkt. No. 36 at 9.)

On July 22, 2017: (1) at about 2:00 a.m., Plaintiff was brought to the prison's Triage and Treatment Area (TTA) for medical attention with complaints of post-operative pain, was assessed as able to walk without his cane, had no chest pain or shortness of breath, was given Tylenol, and was returned to housing at 3:15 a.m. (Dkt. No. 36-3 at 5 ¶ 17); (2) at about 3:50 p.m., Plaintiff called man down complaining he had had "chest pain all day," was evaluated and sent back to housing (*id.* at 5 ¶ 18); and (3) a nurse evaluated Plaintiff's request to be transferred to CTC, assessed Plaintiff's ability to self-care, and denied Plaintiff's request for transfer to CTC (*id.* at 5 ¶ 16).

On July 24, 2017: (1) Dr. Ibrahimi evaluated Plaintiff as "asymptomatic," and noted plans for physical therapy and follow-up with Plaintiff's primary care physician and trauma clinic, (*id.* at 5-6 ¶ 19); and (2) Plaintiff was evaluated for suicide risk and returned to his same housing with an order for a 5-day follow-up (*id.* at 6 ¶ 20).

It was at this juncture that Plaintiff initiated his Medical Grievance, on July 25, 2017.  (Dkt. No. 36-5 at 12, 14.)  Prison staff described the issue presented by Plaintiff as follows:

> Patient is requesting to be treated humanely and to be given medical care adequate to treat his injuries.  Patient states he had heart surgery and lung surgery and upon return from the hospital he was placed in ad-seg instead of CTC.  Patient also states he is being housed in an unfit building as he needs assistance and he should be able to call a nurse.  Patient also needs help showering.

(Dkt. No. 36 at 13; Dkt. No. 36-5 at 13.)  Plaintiff's medical treatment continued, as he awaited response to his Medical Grievance.

On July 26, 2017, Dr. Nguyen evaluated Plaintiff and ordered continuation of daily nurse visits to assess Plaintiff's care needs and health.  (Dkt. No. 36-3 at 6 ¶ 22.)  Plaintiff again inquired about a transfer to the CTC.  (Dkt. No. 36 at 10; Dkt. No. 36-3 at 6 ¶ 23.)  A

United States District Court
Northern District of California

nurse assessment completed the same day indicated that Plaintiff "was observed standing on his own volition, that he was able to transfer to a chair without difficulty, and that his surgical sites appeared well-approximated with no sign of infection."[8]  (Dkt. No. 36 at 10.) Plaintiff was also able to manage normal activities (feeding, hygiene, mobility) and did not require respiratory care.  (*Id.*)

Also on July 26, 2017, a mental health clinician (not a party to this lawsuit) evaluated Plaintiff as part of the 5-day follow-up ordered on July 24, 2017.  (Dkt. No. 36-3 at 6 ¶ 21.)  The mental health clinician inquired about transferring Plaintiff to the CTC and was informed that Plaintiff's vital signs were normal and there was no bed available in the CTC.  (Dkt. No. 36 at 10; Dkt. No. 36-3 at 6 ¶ 21.)

On July 27, 2017, Dr. Bourne evaluated Plaintiff and his test results (echocardiogram, chest CT angiography, and EKG), noted the presence of "small air sacs in the lung" which happen after surgery and resolve with deep breathing, and noted that Plaintiff's stab wounds were "doing well clinically."  (Dkt. No. 36 at 10-11; Dkt. No. 36-3 at 6-7 ¶ 24.)  Dr. Bourne entered a plan of care and ordered a temporary walker to replace Plaintiff's cane.  (Dkt. No. 36 at 11; Dkt. No. 36-3 at 7 ¶¶ 24-25.)

On July 29, 2017, at about 3:00 a.m., Plaintiff was taken to the TTA with complaints of chest pain and anxiety.  (Dkt. No. 36 at 11; Dkt. No. 36-3 at 7 ¶ 26.)

---

[8]  A more complete description of the nurse assessment was that Plaintiff:

> ... feeds himself independently; attends to his personal hygiene independently, but that shower chair is helpful; transfers self independently but describes feeling dizzy/groggy in the morning; uses the toilet or bedside commode independently; is able to wheel himself short distances; needs staples removed; was oriented to person, place, time, situation; and does not require respiratory care.  In the comments section it is noted that Plaintiff was requesting a stay in CTC, but that he was observed standing on own volition to transfer to cha[i]r without difficult[y], surgical sites appear well approximated with no sign of infection.

(Dkt. No. 36-3 at 6 ¶ 23.)

1   Plaintiff's vital signs were normal, he was able to walk without issues, and he had no

2   shortness of breath, fevers, or chills.  (Dkt. No. 36-3 at 7 ¶ 26.)  Plaintiff was given aspirin

3   and Ativan.  (*Id.*)  At 5:00 a.m., Plaintiff asked to leave the TTA, stating he was alright and

4   no longer in pain.  (*Id.*)

5           On August 1, 2017, Plaintiff walked into the prison clinic complaining of mild dull

6   chest pain.  (*Id.* at 8 ¶ 27.)  A nurse advised Plaintiff to continue taking his pain

7   medications and report if the pain re-occurred.  (*Id.*)

8           Plaintiff's relevant medical history concludes on August 1, 2017.  According to Dr.

9   Bright's review of Plaintiffs' medical records, "there is nothing to indicate that Plaintiff

10  suffered demonstrable harm as a result of not being housed in a CTC or hospital setting

11  while he recovered from surgery after the incident that took place on July 12, 2017."  (*Id.*

12  at 8 ¶ 31.)  Plaintiff argues in response that demonstrable harm is shown by an evaluation

13  conducted at NMC two months after his surgery, on September 27, 2017, wherein a

14  clinician noted that his pain would "take several more months to heal."  (Dkt. No. 41 at

15  39.)  Plaintiff further claims multiple falls and "a heavy elbow contusion" as evidence of

16  demonstrable harm.  (*Id.*)

17          Also according to Dr. Bright, the CTC has screening criteria for admission but

18  Plaintiff's medical condition never qualified him for admission to the CTC, and inmates in

19  administrative segregation have access to all medical services.  (Dkt. No. 36-3 at 8-9 ¶¶

20  32-33.)

21  **III.    Plaintiff's Medical Grievance**

22          Plaintiff initiated his Medical Grievance on July 25, 2017.  (Dkt. No. 36-5 at 12,

23  14.)  Plaintiff's Medical Grievance asked for adequate humane treatment for his injuries.

24  (*Id.* at 12.)  Plaintiff complained of having to lie flat or at an awkward angle, struggling out

25  of bed to be fed, medication too low for his pain level, having to beg for medical

26  assistance, needing a shower seat, and begging to be placed in the CTC or any medical

27  housing within the prison.  (*Id.* at 14.)

28                                                              8

United States District Court
Northern District of California

On August 10, 2017, Dr. Bourne interviewed Plaintiff in the first-level review of Plaintiff's Medical Grievance. (*Id.* at 18; Dkt. No. 41 at 85.) Plaintiff maintained he should have been housed in CTC upon his return from NMC because he needed assistance, help with showering, and should be able to call a nurse. (Dkt. No. 36-5 at 18.) Plaintiff acknowledged his condition had improved and he no longer needed specialized medical housing. (*Id.*) Dr. Bright, together with Dr. Bourne, determined at the first level of review that Plaintiff had "received humane and adequate care and CTC housing was not necessary," and they deemed Plaintiff's Medical Grievance partially granted. (*Id.* at 18, 19.)

On October 10, 2017, Defendants Dr. Kumar and Omosaiye issued the second level decision on Plaintiff's Medical Grievance. (*Id.* at 16-17.) They noted that "[p]lacement is determined by the accepting physician" and that the physician had determined there was no need for CTC, such determination "was based upon a thorough evaluation of clinical condition and review of medical chart on 07/19/2017." (*Id.* at 16.)

On March 12, 2018, Defendant Gates denied further responsive action to Plaintiff's Medical Grievance, establishing exhaustion of Plaintiff's Medical Grievance.[9] (Dkt. No. 36 at 13; Dkt. No. 36-5 at 8-9.)

### IV.   Custodial Defendants

Plaintiff claims the remaining Defendants improperly housed him in administrative segregation instead of allowing him to be housed first in the CTC and later in general population, and they improperly denied his Custodial Grievance.

Plaintiff maintains that Institutional Gang Investigators began harassing him after he suffered the assault of July 12, 2017. (Dkt. No. 1 at 11.) Plaintiff complains that

---

[9] The parties do not dispute that none of Plaintiff's four subsequent medical grievances were relevant to his claims regarding the review of the Medical Grievance conducted by Defendants Dr. Bright, Dr. Bourne, Dr. Kumar, Omosaiye, or Gates. (*See* Dkt. No. 36 at 13.)

United States District Court
Northern District of California

Defendant Clavijo issued an order to place Plaintiff in administrative segregation immediately following the July 12, 2017, assault.  (*Id.*)  While Plaintiff was awaiting the ambulance to take him to NMC, Defendant DeAnzo photographed Plaintiff's injuries and told Plaintiff "'when you get back I[']m going to talk to you and your [sic] going to work with me <u>or else.</u>'"  (*Id.* (emphasis in original).)  On July 15, 2017, DeAnzo and another officer arrived at Plaintiff's hospital and unsuccessfully "attempted to pressure [Plaintiff] into cooperation in the investigation of my attempted homicide."  (*Id.*)  Plaintiff did not wish to cooperate, and "was told my refusal to cooperate would be met with reprisals.  I refused to answer any questions and asked them to leave as I was in a great deal of pain."  (*Id.*)

Plaintiff argues that DeAnzo and an unidentified colleague attempted to secure Plaintiff's cooperation on July 28, 2017, telling Plaintiff they would secure a placement in CTC but "only if I 'scratch the[ir] back, they'll scratch mine.'"  (*Id.* at 12.)  Plaintiff claims his placement in medically-inappropriate housing (administrative segregation) was used as leverage to attempt to coerce his cooperation with the investigation into the assault.  (*Id.*)

Plaintiff alleges Defendants Bock, Lopez and Rojas were "all present and active participants" when DeAnzo made another attempt to coerce Plaintiff's cooperation.[10]  (*Id.* at 16.)  At that time, Plaintiff was no longer arguing for a placement in the CTC.  During the time frame Plaintiff was pursuing his Custodial Grievance, the focus of his custodial

---

[10]  There are somewhat contradictory references in the record as to whether this alleged interaction occurred on August 11, 2017, or September 11, 2017.  Plaintiff's handwritten complaint states the date most legibly, as "9-11-17."  (Dkt. No. 1 at 16.)  Plaintiff's handwritten Custodial Grievance is less legible (the date therein could arguably be either 91117 or 81117, at Dkt. No. 36-4 at 10)), which apparently led the persons responding to the Custodial Grievance to give the date as August 11, 2017.  (Dkt. No. 41 at 84.)  There are also contradictory references indicating that Plaintiff submitted his Custodial Grievance on "8-13-17" (*id.* at 31), whereas the copy of the Custodial Grievance itself appears to be dated (with Plaintiff's signature) September 13, 2017, (Dkt. No. 36-4 at 9, 10.)  These minor uncertainties and discrepancies in the record as to exact dates are immaterial because there is no dispute as to the timeliness of the Custodial Grievance, and the Custodial Grievance itself must have been initiated after, and not before, Plaintiff's alleged encounter with DeAnzo.

complaint had shifted.  Whereas Plaintiff's immediate complaint following his return from NMC had been that he was housed in administrative segregation versus the CTC, he subsequently complained that he was housed in administrative segregation versus general population.[11]  (*See infra*; *see also* Dkt. No. 41 at 31-32 (Plaintiff argues that his Custodial Grievance encompasses both topics)).

## V.  Plaintiff's Custodial Grievance

On September 13, 2017, Plaintiff initiated his Custodial Grievance.  (Dkt. No. 36-4 at 9.)  Defendants have submitted a copy of the Custodial Grievance dated September 13, 2017, in which Plaintiff complains that Defendant Clavijo allegedly denied Plaintiff housing in a medical facility and instead ordered that Plaintiff be housed in administrative segregation for being a threat to the safety and security of the institution.  (*Id.* at 10.)  According to Plaintiff's Custodial Grievance:

> I was assaulted according to reports and for this reason I am being housed
> and punished by being placed in a restrictive housing unit.[12]  It's also
> become blatantly apparent that the reason I'm being punished is because I've
> chosen to exercise my constitutional right to remain silent in regard to
> answering and cooperating in the investigation of this incident.

(*Id.*)

Plaintiff's Custodial Grievance claims that Clavijo was influenced by investigators including Defendant DeAnzo, who is an Institutional Gang Investigator.  (*Id.*)  Plaintiff further claims that DeAnzo spoke to Plaintiff while Plaintiff was on a gurney awaiting the ambulance immediately after Plaintiff was injured on July 12, 2017.  (*Id.* at 10.)  Plaintiff alleges DeAnzo told Plaintiff: "when you get back I'm going to talk to you and your[sic] going to work with me or else."  (*Id.*)  Plaintiff complains that DeAnzo harassed Plaintiff

---

[11]  It is unclear from this record precisely how much longer Plaintiff remained in administrative segregation.

[12]  It appears from the text of Plaintiff's Custodial Grievance that he was housed in administrative segregation as of the date he initiated the Custodial Grievance, September 13, 2017.

United States District Court
Northern District of California

"on my hospital bed" and "repeatedly threatened me and refused to have me moved to a medical facility unless I gave him some statement." (*Id.*)

According to Plaintiff's Custodial Grievance, when DeAnzo allegedly confronted Plaintiff on September 11, 2017:

> … he physically threatened me ambushing me after I returned from P.T. threatening to rip me out of my wheelchair and take me to an isolated part of the prison, when I again refused to participate in the investigation, he began verbally threatening saying he's reading my mail, discussing the sexual nature in the letter in homosexual fashion, insulting my looks and teeth, all this in front of C/O Beck[sic], Lopez and Rojas. Because I exercised my constitutional rights administration has chosen to punish me by limiting my medical care, causing me pain.

(*Id.*) Plaintiff asks, "that each person, supervisor or otherwise be so named who is responsible for my being housed in administrative segregation, this in order for me to file a formal complaint." (*Id.* at 9.)

Defendants have submitted partial records regarding the response to Plaintiff's Custodial Grievance. (*See* Dkt. No. 36-3; Dkt. No. 36-4 at 7-11.) Under penalty of perjury, Plaintiff submitted additional records relating to the Custodial Grievance with his response to the motion for summary judgment. (Dkt. No. 41 at 40, 77-84.) Defendants have not disputed the veracity of Plaintiff's records. (Dkt. No. 43.) Plaintiff was interviewed about the encounter with DeAnzo and/or about his Custodial Grievance by Lt. D. Lopez;[13] apparently this occurred on September 12, 2017.[14] (Dkt. No. 36-4 at 7; Dkt.

---

[13] The interviewer, Lt. D. Lopez, is not the same person as Defendant Correctional Officer J. Lopez.

[14] There is, once again, some uncertainty in the record about the date of the interview between Plaintiff and interviewer Lt. D. Lopez. It is unclear why or how the interview would have happened on September 12, 2017, (*see* Dkt. No. 41 at 84,) since it appears the date Plaintiff signed and presumably submitted his Custodial Grievance is the next day, September 13, 2017. (Dkt. No. 36-4 at 9, 10; Dkt. No. 41 at 77, 81.) Nevertheless, the record does make clear that the interview occurred, and it was considered in the first level disposition of the Custodial Grievance, which was issued on October 9, 2017. (Dkt. No. 41 at 84.) This minor uncertainty as to precise dates and the precise sequence of events is immaterial to the Court's analysis.

No. 41 at 84.)  In the interview, Plaintiff objected to his placement in administrative segregation and wished to be returned to regular housing.  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)  There is no mention of CTC housing in the interview summary.  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)  By this time, Plaintiff himself had conceded that he did not need to be in the CTC.  (*See* Dkt. No. 36-5 at 18 (as of August 10, 2017, Plaintiff acknowledged to Defendant Dr. Bourne he no longer needed specialized medical housing)).  Instead, Plaintiff wanted to "go back to the GP Yard."[15]  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)  Plaintiff informed Lt. D. Lopez that he was not going to cooperate with investigators.  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)  (*Id.* ("I'm not going to debrief.").)

The central "Appeal Issue" of the Custodial Grievance as stated by the second-level response was that Plaintiff objected to DeAnzo's conduct in "discussing the sexual nature of [Plaintiff's] letter [from a girlfriend] in a homosexual fashion."  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)  Plaintiff, as noted, objects that this framing misconstrues his real issue, which  was "in regard to my housing in ad-seg."  (Dkt. No. 1 at 4-5.)

Bittner, Bock, DeAnzo, J. Lopez, and Rojas were all questioned in the course of evaluating Plaintiff's Custodial Grievance, but there is no report of their responses.  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)  The finding at the second level of review of Plaintiff's Custodial Grievance was that "Your appeal was Partially Granted:  Officer Deanzo is professional when dealing with you."  (Dkt. No. 36-4 at 7; Dkt. No. 41 at 84.)

Defendant Liu reviewed Plaintiff's Custodial Grievance at the third and final level.  (Dkt. No. 41 at 75.)  According to Liu's summary, the subject of Plaintiff's Custodial Grievance was that he was the victim of the July 12, 2017, assault and his placement in administrative segregation amounted to undeserved punishment as a "result of him exercising his constitutional rights to remain silent during the investigation of the incident."  (*Id.*)  Also, that Plaintiff alleged DeAnzo had subsequently harassed and

---

[15]  This is understood as a reference to the "General Population Yard."

threatened Plaintiff to gain Plaintiff's cooperation with the investigation.  (*Id.*)  Liu found that staff did not violate policy as alleged and Plaintiff's staff complaints had been properly addressed and no further relief would be afforded.  (*Id.*)  Plaintiff's Custodial Grievance was deemed partially granted "in that an inquiry was conducted."  (*Id.*; see also *id*. at 84 (Custodial Grievance partially granted at second level review).)

Liu and Voong both signed the final decision exhausting Plaintiff's Custodial Grievance as of July 25, 2018.  (Dkt. No. 41 at 75, 78.)

Defendants concede that Plaintiff's Custodial Grievance exhausted his claims against Clavijo and DeAnzo.  (Dkt. No. 36 at 17.)  Plaintiff advances arguments why the Custodial Grievance also encompasses his claims against Bittner, Bock, Liu, Lopez, Rojas, and Voong.

Plaintiff argues that Bittner "must share in the responsibility of violating Plaintiff's constitutional rights" because he is DeAnzo's partner.  (Dkt. No. 41 at 33-34.)  Plaintiff further argues that Bock, J. Lopez, and Rojas were "standing around while DeAnz[o] threatened to rip me out of the chair, they w[]ere my escorting officers and therefore must observe the[ir] responsibility to protect me from harm."  (*Id.* at 34.)

Finally, Plaintiff argues that "Lt. D. Lopez,[16] H. Liu and M. Voong became part of the appeal in turn as each played a part in being indifferent to Plaintiff's pain and suffering and each appeal[], second level and third was a complaint against each of their decision making abilities."  (*Id.* at 33.)

Defendants reply that: (1) Plaintiff did not name Bittner anywhere in his Custodial Grievance; (2) Plaintiff mentioned Bock, Lopez, and Rojas in the Custodial Grievance, but did not allege any of them were involved in the decisions to keep Plaintiff in administrative segregation as opposed to the CTC when Plaintiff returned from NMC; and

---

[16]  The Court again notes that "Lt. D. Lopez" is not a party to this lawsuit. Correctional Officer J. Lopez is a Defendant, has been served, and has joined in the motion for summary judgment.  (Dkt. No. 1 at 2.)

United States District Court
Northern District of California

1  (3) with respect to Liu and Voong, "Plaintiff appears to confound his obligation to exhaust

2  administrative remedies with the standard for stating an official-capacity claim against a

3  supervisory Defendant for an alleged policy violation."[17]  (Dkt. No. 43 at 6-7.)

**DISCUSSION**

4  **I.    Standard of Review**

5      Summary judgment is proper where the pleadings, discovery and affidavits show

6  that there is "no genuine issue as to any material fact and that the moving party is entitled

7  to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may

8  affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable

10  jury to return a verdict for the nonmoving party.

11      The moving party for summary judgment bears the initial burden of identifying

12  those portions of the pleadings, discovery and affidavits which demonstrate the absence of

13  a genuine issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).

14  When the moving party has met this burden of production, the nonmoving party must go

15  beyond the pleadings and, by its own affidavits or discovery, set forth specific facts

16  showing that there is a genuine issue for trial.  If the nonmoving party fails to produce

17  enough evidence to show a genuine issue of material fact, the moving party wins.  *Ibid.*

18  **II.   Analysis**

19      A.    Defense of Failure to Exhaust Administrative Remedies

20          1.    Proper Exhaustion Requires Specificity

21  The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321

22  (1996) ("PLRA"), amended 42 U.S.C. § 1997e to provide that "[n]o action shall be

23  brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal

---

[17]  The parties do not dispute that none of Plaintiff's four subsequent non-medical grievances were relevant to his claims regarding the review of the Custodial Grievance conducted by Liu and Voong.  (*See* Dkt. No. 36 at 14.)

United States District Court
Northern District of California

law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement cannot be satisfied "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). "The text of 42 U.S.C. § 1997e(a) strongly suggests that the PLRA uses the term 'exhausted' to mean what the term means in administrative law, where exhaustion means proper exhaustion." *Id.* at 92. Therefore, the PLRA exhaustion requirement requires proper exhaustion. *Id.* "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91 (footnote omitted).

Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." *Jones v. Bock*, 549 U.S. 199, 217-18 (2007). The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. *Id.* at 218.

The California Department of Corrections and Rehabilitation ("CDCR") provides its inmates the right to appeal administratively "any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a). Since January 28, 2011, California regulations governing grievances require the inmate to name "all staff member(s) involved" and "describe their involvement in the issue." Cal. Code Regs. tit. 15, § 3084.2(a)(3) (repealed June 1, 2020); *see also* Cal. Code Regs. tit. 15, § 3482(c)(2) (effective June 1, 2020) (grievance shall "describe all information known and available to the claimant regarding the claim, including … names and titles of all involved staff members (or a description of those staff members), and names and titles of all witnesses").

Until September 1, 2017, all inmate grievances – including medical and non-

medical grievances - were governed by same provisions of the California Code of Regulations, title 15, §§ 3084-3086.  To submit an administrative grievance, an inmate must use an Inmate/Parolee Appeal on CDCR Form 602 (grievance form) to "describe the specific issue under appeal and the relief requested." *Id.* § 3084.2(a).  The form requires the inmate to identify by name and title or position, each staff member alleged to be involved in the action or decision being appealed, along with the dates each staff member was involved in the issue being appealed.  *Id.* § 3084.2(a)(3).  If this information is not available, the inmate must provide any other available information that would assist the Appeals Coordinator in identifying the staff member.  *Id.*

As of September 1, 2017, inmate health care grievances were governed by a separate set of provisions at California Code of Regulations, title 15, §§ 3999.225-3999.237.  Whereas the process for health care grievances previously provided for three levels of administrative review before administrative remedies were deemed exhausted, the current regulations entail only two levels, an institutional level of review and a headquarters level of review.  *Id.* § 3999.226(a)(1).  Like the former regulations, § 3999.228(g) retains the requirement for inmates to "document clearly and coherently all information known and available" to the inmate when preparing and submitting a health care grievance.  *Id.* § 3999.227(g).  This includes identifying "any involved staff member's last name, first initial, title or position, and the date(s) and description of their involvement."  *Id.* § 3999.227(g)(1).  A grievant who does not know names of involved staff members must "provide any other available information that may assist in processing the health care grievance."  *Id.* § 3999.227(g)(2).

Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove."  *Jones*, 549 U.S. at 204, 216.  Defendants have the burden of raising and proving the absence of exhaustion, and inmates are not required to specifically plead or demonstrate exhaustion in their complaints.  *Id.* at 215-17.  The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not

exhaust that available administrative remedy. *Albino v. Baca*, 747 F.3d 1162, 1172, 1176 (9th Cir. 2014) (en banc). Once the defendant has carried that burden, the prisoner has the burden of production. *Id.* at 1172. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. *Id.* But as required by *Jones*, the ultimate burden of proof remains with the defendant. *Id.*

Exhaustion must ordinarily be decided in a summary judgment motion, before reaching the merits of a prisoner's claim. *Albino*, 747 F.3d at 1166. If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. *Id.* Disputed factual questions relevant to exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides disputed factual questions to jurisdiction and venue. *Id.* at 1170 (citing cases). But whenever feasible, disputed factual questions relevant to exhaustion should be decided at the very beginning of the litigation. *Id.* at 1171.

### 2.    Failure to Exhaust - Dr. Bright, Gates, Dr. Kumar, and Omosaiye

Defendants argue that Plaintiff's exhausted Medical Grievance does not exhaust his claims against Defendants Dr. Bright (in his role as reviewer of Plaintiff's Medical Grievance), Gates, Dr. Kumar, and Omosaiye, as to their alleged deliberate indifference in reviewing and deciding his Medical Grievance. (Dkt. No. 36 at 18.) It is undisputed that Plaintiff did not initiate any grievance that complained of deliberate indifference by the Defendants who reviewed and/or responded to his Medical Grievance. (*See id.* at 13; Dkt. No. 41 at 30.)

Plaintiff argues that prison officials who play a role in denying a grievance are implicitly encompassed within the scope of the grievance as it advances through the grievance process. (Dkt. No. 41 at 31 ("The Defendants become supervisor as they answer the grievance and the[y] become named as the[y are] appealed at each step respect[ive]ly.").) Plaintiff also argues that *Jones*, 549 U.S. at  217, held the Sixth Circuit

was wrong to require a prisoner to name prison staff in the grievance so long as the grievance alerted prison officials to the problem and facilitated resolution.  (*Id.* at 30.) Plaintiff's argument misses the core of the Supreme Court's holding.  *Jones* held that the lower court was wrong to impose requirements – such as naming all involved prison officials - that were not already explicit in the prison's grievance procedures.  549 U.S. at 218.  In *Jones*, the Michigan Department of Corrections' grievance procedures did not require the prisoner to name all involved prison officials, and therefore the lower court was wrong to impose such a prerequisite.  *Id.*

According to the holding of *Jones*, the question is whether the prison's grievance procedures require the prisoner to name all involved prison officials in the grievance. Compliance with prison grievance procedures is what is required by the PLRA to "properly exhaust" administrative remedies.  *Id.* at 217-18; *id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

California's grievance regulations, as well as California's medical grievance regulations, do require the prisoner to identify the staff members who are the subject of the grievance and/or medical grievance.  *See* Cal. Code Regs. tit. 15, § 3084.2(a)(3) (repealed eff. June 1, 2020).  The grievance provision in effect as of the date Plaintiff initiated his Medical Grievance on July 25, 2017, as well as the date Plaintiff initiated his Custodial Grievance on September 13, 2017, required inmates to identify by name and title or position, each staff member alleged to be involved in the action or decision being appealed, along with the dates each staff member was involved in the issue being appealed. Providing names of involved staff is the necessary "level of detail" required under California's grievance regulations, and is therefore enforceable according to the reasoning of *Jones*.  *See also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) (an inmate must

"provide the level of detail required by the prison's regulations" in order to give "adequate notice" of the inmate's issue).

Plaintiff failed to notify prison officials that he had an independent issue with the manner in which Dr. Bright, Gates, Dr. Kumar, and Omosaiye had handled his Medical Grievance. To do so, Plaintiff would have had to initiate a separate grievance against them alleging his issues (presumably, their alleged deliberate indifference in their roles in the process of deciding Plaintiff's Medical Grievance).[18] A mere appeal to the next level of grievance review does not give notice that prison officials involved in lower levels of review are newly rolled-up into the substantive investigation of the grievance itself – as if an ordinary appeal to an appellate court automatically makes the trial court judge a party encompassed within the substantive issues of the appeal. Plaintiff points to no provision in California's grievance regulations supporting such an interpretation.

Plaintiff was required to, but did not, initiate a separate grievance against any of Dr. Bright, Gates,[19] Dr. Kumar, and Omosaiye alleging deliberate indifference in their roles in the process of deciding Plaintiff's Medical Grievance.[20] Plaintiff did not initiate and did not exhaust available administrative remedies against these Defendants for their roles in denying Plaintiff's Medical Grievance.

Accordingly, the motion for summary judgment of Defendants Dr. Bright (only in his role as reviewer of Plaintiff's Medical Grievance), Gates, Dr. Kumar, and Omosaiye,

---

[18] For example, Plaintiff argues that Dr. Bright, in the role of first-level reviewer of Plaintiff's Medical Grievance, was inherently conflicted in that he was "attempting be an expert witness in his own culpability" and was therefore biased. (Dkt. No. 41 at 38.) Defendants reply that Dr. Bright provided permissible, qualified expert opinion. (Dkt. No. 43 at 9.) This is precisely the sort of issue that Plaintiff could have, but did not, present in a separate medical grievance identifying Dr. Bright.

[19] Indeed, Gates was the prison official who decided Plaintiff's Medical Grievance at the final level of review. There was no further review available after Gates' decision.

[20] Each of these Defendants identified themselves to Plaintiff in the course of reviewing Plaintiff's Medical Grievance. (Dkt. No. 36-5 at 8-9, 16, 18.)

on grounds that Plaintiff failed to exhaust administrative remedies against them is GRANTED.

### 3.     Failure to Exhaust – unserved Defendant Dr. Bourne

It is an abuse of discretion for the Court to dismiss an action against an unserved defendant without giving prior notice to plaintiff and providing him with an opportunity to show good cause or excusable neglect. *Crowley v. Bannister*, 734 F.3d 967, 977-78 (9th Cir. 2013) (reversing district court's dismissal of unserved defendant where "the complaint's deficiencies could be cured by naming the correct defendant," and where the court had not provided the required Rule 4(m) notice prior to the clerk's entry of judgment); *see also West v. United States*, 853 F.3d 520, 524 (9th Cir. 2017) (district court committed clear error in dismissing claims against an unserved party when time for service had not expired, and where the district court had failed to distinguish between claims against the served party and the unserved party).

Yet there are circumstances where the district court may dismiss claims against unserved defendants. In ruling on a dispositive motion filed by defendants who have been served, the district court may grant judgment in favor of defendants who have not been served or have not yet appeared, on the Court's own authority without prompting by any of the parties. *See Abagninin v. AMVAC Chemical Corp.*, 545 F.3d 733, 742-43 (9th Cir. 2008) (holding district court properly granted motion for judgment on the pleadings as to unserved defendants where such defendants were in a position similar to served defendants against whom claim for relief could not be stated and "on the basis of facts presented by other defendants which had appeared" further amendment of the complaint "would be futile"); *Columbia Steel Fabricators v. Ahlstrom Recovery*, 44 F.3d 800, 802-03 (9th Cir. 1995) (affirming grant of summary judgment in favor of non-appearing defendant where plaintiff, in response to summary judgment motion filed by defendant who had appeared, had "full and fair opportunity to brief and present evidence" on dispositive issues that were the "same issues controlling" the claim against non-appearing defendant); *Silverton v.*

21

1    *Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981) (district court on its own motion

2    may grant motion to dismiss as to defendants who have not moved to dismiss where such

3    defendants are in a position similar to that of moving defendants).

4        Unserved Defendant Dr. Bourne interviewed Plaintiff at the first level of review of

5    Plaintiff's Medical Grievance.  (Dkt. No. 36-5 at 18.)  To the extent that Plaintiff's claims

6    against Dr. Bourne are based on Dr. Bourne's role in the grievance decision-making

7    process, Dr. Bourne is in a position identical to Defendants Dr. Bright, Gates, Dr. Kumar,

8    and Omosaiye.  *See Abagninin*, 545 F.3d at 742-43.  Plaintiff has had a "full and fair

9    opportunity to brief and present evidence" on the dispositive question whether Plaintiff

10   exhausted a grievance against the prison officials who reviewed Plaintiff's Medical

11   Grievance.  *See Columbia Steel*, 44 F.3d at 802-03.  This is the same issue that controls

12   this portion of Plaintiff's claim against Dr. Bourne.  *See id.*  The Court on its own motion

13   will dismiss Plaintiff's claim that Dr. Bourne was deliberately indifferent as to the role he

14   played in the review of Plaintiff's Medical Grievance.  *Id.*; *Silverton*, 644 F.2d at 1345.

15       Accordingly, the Court on its own motion and in the interests of judicial economy

16   will GRANT summary judgment on Plaintiff's claim against Defendant Dr. Bourne

17   regarding Dr. Bourne's review of Plaintiff's Medical Grievance.

18           4.   Failure to Exhaust – Defendants Liu and Voong

19       Defendants argue that Plaintiff's exhausted Custodial Grievance does not exhaust

20   his claims against Defendants Liu and Voong, as to their alleged deliberate indifference in

21   reviewing and deciding his Custodial Grievance.  (Dkt. No. 36 at 17-18.)  It is undisputed

22   that Plaintiff did not initiate any grievance that complained of deliberate indifference by

23   the persons who reviewed and/or responded to his Custodial Grievance.  (*See id.*; Dkt. No.

24   41 at 32.)

25       Plaintiff argues that "99.9% of his complaint was ignored" by Liu and Voong.

26   (Dkt. No. 41 at 31.)  Plaintiff complains that the reviewers "took one half of one sentence"

27   of his Custodial Grievance "and made this the sole issue."  (*Id.* at 32.  Plaintiff, however,

28

22

United States District Court
Northern District of California

acknowledges "I didn't complain about Liu and Voong or 602 them." (*Id.*)  According to Plaintiff: "That's not how the process works.  They are the final say there is no appeal from the appeal that would be considered a duplicate appeal and grounds for rejection (title 15 §§ 3084.6(c)(2) or § 3084.6(c)(1)." (*Id.*)

This is the same circular argument that Plaintiff suggested with respect to the Defendants who reviewed his Medical Grievance – that any prison official who plays a role in denying a grievance becomes automatically encompassed within the substantive topic of the grievance, presumably at the next level of review.  Indeed, Plaintiff's argument is even more strained here because Liu and Voong investigated and decided the third and final level of grievance review – California's grievance regulations do not provide for any further level of review, so the actions of Liu and Voong were never investigated nor examined by anyone else.  (Dkt. No. 36 at 13.)

The provisions Plaintiff cites do not authorize such an interpretation of California's grievance regulations.  Cal. Code Regs. tit. 15, § 3084.6(c)(1) (repealed eff. June 1, 2020) states that an inmate's grievance can be canceled if defective for reasons the inmate could not correct – such as not being within the jurisdiction of the CDCR.  Cal. Code Regs. tit. 15, § 3084.6(c)(2) (repealed eff. June 1, 2020) states that an inmate's grievance can be cancelled if duplicative of another previous or pending grievance.  There is nothing in the record to indicate that Plaintiff submitted any grievance against Liu and Voong that was cancelled for these reasons, nor any basis to conclude a grievance against Liu and Voong would have been canceled for these reasons.  (*See* Dkt. No. 36 at 14 (Plaintiff submitted four other grievance appeals, but none of them complained about Liu and Voong).)

Plaintiff was required to, but did not, initiate a separate grievance against either Liu or Voong identifying them and complaining of their conduct in the process of deciding Plaintiff's Custodial Grievance.  *See* Cal. Code Regs. tit. 15, § 3084.2(a)(3) (repealed eff. June 1, 2020) (inmate is required to identify by name and title or position, each staff member alleged to be involved in the action or decision being appealed, along with the

United States District Court
Northern District of California

dates each staff member was involved in the issue being appealed); *Sapp*, 623 F.3d at 824 (inmate must "provide the level of detail required by the prison's regulations" in order to give "adequate notice" of the inmate's issue). Plaintiff perforce did not exhaust available administrative remedies regarding his claims against Liu and Voong.

Accordingly, the motion for summary judgment of Defendants Liu and Voong, on grounds that Plaintiff failed to exhaust administrative remedies against them is GRANTED.

5.   Failure to Exhaust – Defendants Bittner, Bock, Lopez, and Rojas

Defendants argue that Plaintiff's exhausted Custodial Grievance does not exhaust his claims against Defendants Bittner, Bock, Lopez, and Rojas. (Dkt. No. 36 at 17.) Plaintiff's Custodial Grievance did mention – in passing –Bock, Lopez, and Rojas, in which Plaintiff complained that Defendant DeAnzo threatened and insulted Plaintiff "in front of C/O Beck[sic], Lopez and Rojas." (Dkt. No. 36-4 at 10.) Plaintiff did not give the name of Bittner, who is DeAnzo's partner, in the Custodial Grievance. (*Id.*)

Bittner, Bock, Lopez, and Rojas were all interviewed by prison officials who reviewed Plaintiff's Custodial Grievance. (Dkt. No. 41 at 80, 84.) In other words, they were treated as witnesses. However, since the Custodial Grievance does not state any explicit issue with any of these Defendants, prison officials were not alerted to any specific issue with their behavior. *See Sapp*, 623 F.3d at 824 (inmate must "provide the level of detail required by the prison's regulations" in order to give "adequate notice" of the inmate's issue).

Plaintiff argues in his response to the motion for summary judgment that Bock, Lopez, and Rojas were "standing around while DeAnz[o] threatened to rip me out of the chair, they w[]ere my escorting officers and therefore must observe the[ir] responsibility to protect me from harm." (Dkt. No. 41 at 34.) These alleged issues with Bock, Lopez, and Rojas were not set forth in Plaintiff's Custodial Grievance, so as to comply with

24

1   California's grievance regulations and alert prison officials to investigate Bock, Lopez, and

2   Rojas.  *See Sapp*, 623 F.3d at 824.

3        Plaintiff's argument with respect to un-named Defendant Bittner – that he should be

4   deemed encompassed within the scope of the Custodial Grievance simply by virtue of

5   being DeAnzo's partner – is completely unsupported by the grievance regulations.  *See*

6   Cal. Code Regs. tit. 15, § 3084.2(a)(3) (repealed eff. June 1, 2020) (inmate is required to

7   identify by name and title or position, each staff member alleged to be involved in the

8   action or decision being appealed, along with the dates each staff member was involved in

9   the issue being appealed); *Sapp*, 623 F.3d at 824 (inmate must "provide the level of detail

10  required by the prison's regulations" in order to give "adequate notice" of the inmate's

11  issue).

12       Accordingly, the motion for summary judgment of Defendants Bittner, Bock,

13  Lopez, and Rojas, on grounds that Plaintiff failed to exhaust administrative remedies

14  against them is GRANTED.

15       B.   Plaintiff's Claims of Deliberate Indifference to Serious Medical Needs

16            1.   Deliberate Indifference Standard

17       Defendants do not dispute that the Medical Grievance exhausted Plaintiff's claims

18  regarding the alleged deliberate indifference of his medical providers.  (Dkt. No. 36 at 18.)

19  This includes Plaintiff's claims against Defendant Dr. Ibrahimi, and also Defendant Dr.

20  Bright to the extent he was involved in providing care to Plaintiff.

21       Deliberate indifference to a prisoner's serious medical needs violates the Eighth

22  Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*,

23  429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an

24  examination of two elements: the seriousness of the prisoner's medical need and the nature

25  of the defendant's response to that need.  *See McGuckin v. Smith*, 974 F.2d 1050, 1059

26  (9th Cir. 1992), *overruled in part on other grounds by WMX Technologies, Inc. v. Miller*,

27  104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

28                                    25

United States District Court
Northern District of California

a)      Serious Medical Need

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

b)      Deliberate Indifference

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson*, 290 F.3d at 1188.

In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060; *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Additionally, the defendant's actions must be the cause of the injury suffered by the plaintiff. *Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2010), *reinstated as modified by* 658 F.3d 897 (9th Cir. 2011); *see id.* at 1098-1102 (reversing grant of summary judgment to transporting police officers where children of pre-trial detainee who committed suicide presented evidence that transporting police officers (a) were subjectively aware the decedent was at acute risk of harm (suicide); (b) failed to respond properly to that risk by informing jail officials; and (c) such failure was both the

26

1  actual and proximate cause of the decedent's suicide once at the jail).  A finding that the

2  defendant's activities resulted in "substantial" harm to the prisoner is not necessary, but the

3  existence of serious harm tends to support an inmate's deliberate indifference claims, *Jett*

4  *v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin*, 974 at 1060).

5         Once the prerequisites are met, it is up to the factfinder to determine whether

6  deliberate indifference was exhibited by the defendant.  Such indifference may appear

7  when prison officials deny, delay, or intentionally interfere with medical treatment, or it

8  may be shown in the way in which prison officials provide medical care.  *See McGuckin*,

9  974 F.2d at 1062 (delay of seven months in providing medical care during which medical

10  condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain"

11  sufficient to present colorable § 1983 claim).  *Compare Lolli v. County of Orange*, 351

12  F.3d 410, 420-21 (9th Cir. 2003) (applying subjective deliberate indifference test and

13  holding that a jury could infer that correctional officers' failure to provide medical care in

14  response to detainee's extreme behavior, sickly appearance and statements that he was

15  diabetic and needed food demonstrated deliberate indifference); *and Clement v. Gomez*,

16  298 F.3d 898, 905 (9th Cir. 2002) (jury could find deliberate indifference where officials

17  denied showers and medical attention to inmates who had been exposed to pepper-spray

18  where officials themselves were coughing and gagging and stepped outside for fresh air,

19  and the inmates made repeated requests for attention); *with Peralta v. Dillard*, 744 F.3d

20  1076, 1083-84 (9th Cir. 2014) (en banc) (jury can be instructed to consider whether

21  medical official lacked necessary resources when determining if medical official was

22  deliberately indifferent with respect to monetary damages).

23         The deliberate indifference standard does not require a showing that the prison

24  official acted with an improper motive, such as an intent to harm; it is enough that the

25  official acted or failed to act despite knowledge of a substantial risk of serious harm.

26  *Edmo v. Corizon*, 935 F.3d 757, 793 (9th Cir. 2019), *reh'g en banc denied by* 949 F.3d 489

27  (9th Cir. 2020) (prison doctor exhibited deliberate indifference when he knew of and

28

disregarded an excessive risk to plaintiff's health by rejecting her request for GCS and then never re-evaluating his decision despite evidence that plaintiff continued to suffer clinically significant distress even though he provided other treatment to plaintiff).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058. A prison medical officer without expertise in a specific field who denies an inmate appeal for medical care after it was reviewed by two qualified medical officials, does not demonstrate a wanton infliction of unnecessary pain. *Peralta*, 744 F.3d at 1086-87.

A failure to provide treatment because administrative reasons prevented a prisoner from being sent to a non-contracted facility would be a failure to provide treatment for non-medical reasons, which is sufficient to generate a genuine issue of material fact as to deliberate indifference on the part of the doctor failing to treat the patient. *Jett*, 439 F.3d 1097. In deciding whether there has been deliberate indifference to an inmate's serious medical needs, the court need not defer to the judgment of prison doctors or administrators. *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989). A prison medical officer without expertise in a specific field who denies an inmate appeal for medical care after it was reviewed by two qualified medical officials, does not demonstrate a wanton infliction of unnecessary pain. *Peralta*, 744 F.3d at 1086-87.

## 2. Defendants Dr. Ibrahimi and Dr. Bright

Defendants do not dispute that Plaintiff's Medical Grievance exhausted his administrative remedies with respect to his claim regarding the medical care provided by Defendants Dr. Ibrahimi and Dr. Bright. (Dkt. No. 36 at 18.)

28

1

2

3

4

5

6

7

8

9

The medical care provided by Dr. Ibrahimi included: (1) sending Plaintiff to NMC immediately after he was injured on July 12, 2017 (Dkt. No. 36-3 at 3 ¶ 6); (2) sending Plaintiff back to NMC for reevaluation on July 20, 2017 (*id.* at 3-4 ¶ 11); (3) conferring with an NMC nurse when NMC sent Plaintiff back to SVSP (*id.* at 4 ¶ 13); (4) again approving Plaintiff for "normal housing" upon his return to SVSP, with daily wound care, a short-term wheelchair for 24 hours, physical therapy, and a walker if needed (*id.* at 4 ¶ 14); (5) evaluating Plaintiff on July 24, 2017, "asymptomatic" and noting plans for physical therapy and follow-up with Plaintiff's primary care physician and trauma clinic (*id.* at 5-6 ¶ 19).

10

11

12

13

14

15

Dr. Bright's role in Plaintiff's medical care was more limited.  Dr. Bright was on-call when Plaintiff returned to SVSP from NMC on July 19, 2017.  (*Id.* at 48.)  Dr. Bright, as well as Defendant Dr. Nguyen, separately conferred with NMC medical providers (a doctor, a nurse practitioner, and a nurse).  (*Id.* at 3 ¶¶ 7-9.)  Based on these discussions, Dr. Bright determined that "Plaintiff did not need a higher level of care and that he could return to his normal housing."  (*Id.* at 3 ¶ 9; Dkt. No. 36 at 8; Dkt. No. 36-3 at 48.)

16

17

18

19

Defendants do not dispute that Plaintiff had serious medical needs when he returned from NMC after his surgery, but they contend that Plaintiff has failed to produce sufficient evidence of their deliberate indifference to his serious medical needs to avoid summary judgment.  (Dkt. No. 36 at 15, 20.)

20

21

22

23

24

25

26

Defendants argue that the record of medical care provided to Plaintiff demonstrates his medical providers did not disregard any of Plaintiff's serious medical needs.  (*Id.* at 20-22.)  Defendants point to the "near daily" assessments performed after Plaintiff returned from NMC on July 19, 2017.  (*Id.* at 20.)  Defendants argue that Plaintiff did not meet screening criteria for admission to the CTC.  (*Id.* at 12.)  Defendants further argue that Plaintiff did not suffer demonstrable harm by virtue of being housed in administrative segregation instead of the CTC.  (*Id.* at 22.)

27

28

United States District Court
Northern District of California

29

1
2
3
4
5
6
7
8

Plaintiff argues, "[e]ven though [I] was seen on a daily basis, does not mean the defendants actions were adequate." (Dkt. No. 41 at 36.)  He asserts that Defendants "knew I was hurting" and "ran tests and then ignored what they chose to." (*Id.* at 36-37.)  He cites the pain from his collapsed lung. (*Id.* at 37.)  He complains that Dr. Ibrahimi was aware of Plaintiff's collapsed lung, X-ray result, and history, yet "chose to send me back to a single cell, living condition that does nothing but exacerbate my pain and suffering." (*Id.* at 37-38.)  Plaintiff claims that Dr. Ibrahimi was wrong to describe the X-ray results as "'negative for any acute significant findings'" and he thereby "hid[] the truth." (*Id.* at 38.)

9
10
11
12
13
14
15
16

Plaintiff argues that he suffered demonstrable harm by virtue of being housed in administrative segregation as opposed to a prison hospital setting (i.e., the CTC). (*Id.* at 38-39.)  Plaintiff submits as evidence a clinical note made on a September 27, 2017, follow-up visit to NMC which anticipated that Plaintiff's pain from his surgery would "take several more months to heal" (*Id.* at 39.)  Plaintiff claims his pain "was due to 'positional discomfort' as reported by Dr. Ibrahimi," and "wasn't simple pain, but pain caused by partial collapse of lung and the healing of a chest that has been cut through." (*Id.*)  Plaintiff further points to falls that left him with "a heavy elbow contusion." (*Id.*)

17
18
19
20
21
22
23
24

Viewing the undisputed factual record in the light most favorable to Plaintiff, Plaintiff has failed to demonstrate that Dr. Ibrahimi and Dr. Bright disregarded any of Plaintiff's serious medical needs in the course of the medical care they provided to Plaintiff.  Dr. Ibrahimi and Dr. Bright based their decisions on consultations with medical professionals at NMC, their own professional evaluations of Plaintiff, daily assessments of Plaintiff's condition, and the stated criteria for admission to the CTC.  There is no evidence their decisions were likely to increase the risk of serious harm to Plaintiff, let alone that they *knew* they were increasing such a risk.

25
26
27

Plaintiff has also failed to demonstrate that being housed in administrative segregation instead of the CTC caused a substantial risk of serious harm.  Plaintiff's asserted harm resulting from being denied housing in the CTC was that his surgical

28

30

recovery was lengthy, "positional discomfort," and a heavy elbow bruise from a fall. There is no evidence that the recovery would have been shorter, that he would not have experienced positional discomfort, or would not have experienced a fall had he been housed in the CTC.   There is also no evidence that these asserted harms were sufficiently serious to implicate the Eighth Amendment.  Consequently, there is no triable factual issue from which a reasonable fact-finder could conclude that Dr. Ibrahimi and Dr. Bright knowingly disregarded a substantial risk of serious harm to Plaintiff by being housed in administrative segregation as opposed to the CTC.

Accordingly, the motion for summary judgment of Defendants Dr. Ibrahimi and Dr. Bright, on grounds that they were not deliberately indifferent to Plaintiff's serious medical needs, is GRANTED.

### 3.    Unserved Defendants Dr. Bourne and Dr. Nguyen

The record before the Court thoroughly describes the undisputed details of the medical care provided by the two unserved medical providers, Defendants Dr. Bourne and Dr. Nguyen.

The medical care provided specifically by Dr. Bourne included: (1) as Plaintiff's primary care provider, seeing Plaintiff on July 21, 2017, and entering orders to continue wound care and adjusting Plaintiff's pain medication (Dkt. No. 36 at 9, Dkt. No. 36-3 at 4 ¶ 5); and (2) evaluating Plaintiff and Plaintiff's test results on July 27, 2017, noting that Plaintiff's wounds were "doing well clinically," and entering a plan of care and ordering a temporary walker to replace Plaintiff's cane (Dkt. No. 36 at 10-11, Dkt. No. 36-3 at 6-7 ¶ 24).

The medical care provided specifically by Dr. Nguyen included: (1) conferring with NMC medical providers upon Plaintiff's return to SVSP on July 19, 2017, and approving Plaintiff for "normal housing" with daily wound care by a nurse (Dkt. No. 36 at 8, Dkt. No. 36-3 at 3 ¶¶ 7-9); and (2) evaluating Plaintiff on July 26, 2017 and ordering continuation of daily nurse visits to assess Plaintiff's care needs and health (Dkt. No. 36-3

United States District Court
Northern District of California

at 6 ¶ 22).

Dr. Bourne and Dr. Nguyen are in a position virtually identical to that of Dr. Ibrahimi and Dr. Bright. *Cf. Abagninin*, 545 F.3d at 742-43. Plaintiff has had a "full and fair opportunity to brief and present evidence" on the dispositive question whether his medical providers at SVSP were deliberately indifferent to his serious medical needs. *Cf. Columbia Steel*, 44 F.3d at 802-03. This is the same issue that controls Plaintiff's deliberate indifference claims against Dr. Bourne and Dr. Nguyen. *Cf. id.*

For the same reasons discussed above with respect to Dr. Ibrahimi and Dr. Bright, viewing the undisputed factual record in the light most favorable to Plaintiff, Plaintiff has failed to demonstrate that Dr. Bourne and Dr. Nguyen knowingly disregarded Plaintiff's serious medical needs or knowingly caused a substantial risk of serious harm by not moving him from administrative segregation to the CTC. Consequently, Dr. Bourne and Dr. Nguyen will be GRANTED summary judgment on Plaintiff's Eighth Amendment claims.

4.    Defendants Clavijo and DeAnzo

Plaintiff's Eighth Amendment claims against Defendants Clavijo and DeAnzo are based upon their respective roles in housing Plaintiff in administrative segregation. Clavijo issued the administrative segregation order immediately following the July 12, 2017, assault. DeAnzo allegedly kept Plaintiff in administrative segregation long after Plaintiff had any arguable need for housing in the CTC.[21]

---

[21]  Plaintiff's alleged need for specialized medical housing ended no later than August 10, 2017, when Plaintiff acknowledged during his Medical Grievance interview with Defendant Dr. Bourne that his condition had improved and he did not need CTC housing. (Dkt. No. 36-5 at 18.) According to Plaintiff's Custodial Grievance, he was still housed in administrative segregation as of September 13, 2017. (Dkt. No. 36-4 at 9.) It is unclear from this record how much longer Plaintiff remained housed in administrative segregation.

United States District Court
Northern District of California

For the reasons discussed above, there is no evidence that housing Plaintiff in administrative segregation instead of the CTC was a medical necessity, let alone that any of the Defendants knew that to be the case.  In any event, moreover, Plaintiff has failed to show that either Clavijo or DeAnzo played any causal role in denying Plaintiff housing in the CTC.  *Cf. Conn*, 591 F.3d at 1098 (the defendant's actions must be the cause of Plaintiff's injury).  The evidence is uncontradicted that it was Plaintiff's medical providers who determined that Plaintiff did not meet criteria for CTC housing, not Clavijo nor DeAnzo.

Accordingly, the motion for summary judgment of Defendants Clavijo and DeAnzo on Plaintiff's Eighth Amendment retaliation claim is GRANTED.

C.      Retaliation Claim

Upon further review of the pleadings, the Court finds that, when liberally construed, Plaintiff's allegations raise a claim for retaliation by Defendants Clavijo and DeAnzo, in violation of his First Amendment rights  (Dkt. No. 1 at 11-12.)  Specifically, his allegations assert that Clavijo and DeAnzo retaliated against him for refusing to cooperate in their investigation into the assault by assigning him to and keeping him in administrative segregation.   (*Id.*)

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

Plaintiff's allegations do not satisfy the third element of protected conduct.   The Court is aware of no authority that refusal to cooperate in a prison investigation of assault is conduct or speech protected by the First Amendment or any other constitutional right.  *See Crockett v. Jensen*, No. CV 16-00959-PHX-JJT (JZB), 2018 WL 10809993 *5 (D. Ariz. July 25, 2018) (citing cases from Northern District of California, Western District of

33

Kentucky, and Eastern District of Michigan, the Court was unable to locate authority indicating that refusal to become a prison informant is protected conduct); *Hermosillo v. Santa Clara County*, No. C 08-0916 JF (PR), 2008 WL 2156994 *2 (N.D. Cal. May 21, 2008) ("Plaintiff cites no authority, and the Court is not aware of any, that the refusal to cooperate with jail officials as an informant for their investigations is a constitutionally protected activity"). Even if such non-cooperation were constitutionally protected, moreover, the fifth element of a retaliation claim is not met. It is clear that Defendants' segregation of Plaintiff after his assault while they investigated the assault and until the perpetrators could be discovered and safely segregated from him served the legitimate penological interest of maintaining the integrity of the investigation and the security of the prison. *See Bryant v. Cortez*, 536 F.Supp. 1160, 1169 (C.D. Cal. 2008) (keeping uncooperative prisoner in segregation while prison officials completed an investigation served legitimate penological interest of maintaining the integrity of the investigation).

Plaintiff's allegations therefore do not state a cognizable claim for retaliation against Defendants Clavijo and DeAnzo in violation of his First Amendment rights. Consequently, this claim is DISMISSED.

D.    Qualified Immunity

Defendants assert in the alternative that they are entitled to qualified immunity from liability for civil damages. (Dkt No. 36 at 23-24.) Because Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claims on other grounds, and because the First Amendment retaliation claim is not cognizable, the Court does not reach Defendants' qualified immunity argument.

E.    Discovery

Plaintiff has filed a motion to compel discovery of privileged and/or confidential documents from the Custodial Grievance, apparently relating to the referral and the interviews conducted by Investigator D. Lopez's interviews. (Dkt. No. 37; Dkt. No. 42.) This motion was already denied. (ECF No. 38.) Moreover, in light of the Court's analysis

1   set forth above, these discovery materials are not relevant to the dispositive issues, and

2   Plaintiff's motion to compel will be DENIED.

3                                    **CONCLUSION**

4           For the foregoing reasons, Defendants' motion for summary judgment is

5   GRANTED, and summary judgment is GRANTED in favor of the two unserved

6   Defendants.[22]  Plaintiff's retaliation claim is DISMISSED.  Plaintiff's motion to compel

7   discovery is DENIED.

8           The clerk shall enter judgment and close the file.

9           **IT IS SO ORDERED.**

10  Dated:  May 19, 2023                    _____

11                                          JEFFREY S. WHITE
                                            United States District Judge

_United States District Court_
_Northern District of California_

---

[22] The portion of the Eighth Amendment claim that is subject to summary judgment on exhaustion grounds, as discussed above, is DISMISSED without prejudice.